IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

VONCEIL L. WESTON,
Plaintiff,

vs. Case No. 3:07cv263/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
Defendant.
_______________________________/

**REPORT AND RECOMMENDATION**

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on May 7, 2004, claiming that she was suicidal and suffered from depression and hallucinations (Tr. 65–67, 74, 89). Plaintiff's application was denied initially and on reconsideration, and she appealed the denial to an administrative law judge (ALJ) (Tr. 46–49, 36–39). An administrative hearing was held on November 15, 2006 (Tr. 239–59). On

December 8, 2006, an ALJ found that Plaintiff was "not disabled" (Tr. 11–21). The Appeals Council denied Plaintiff's request for review on April 26, 2007. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II. FINDINGS OF THE ALJ

On December 8, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 11–21):

1) Plaintiff has not engaged in substantial gainful activity since February 1, 2000, the alleged onset of disability date (20 C.F.R. § 416.920(b) and 416.971 *et seq*.).[1]

2) Plaintiff has the following severe impairment: Major Depressive Disorder (20 C.F.R. § 416.920(c)).

3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

4) Plaintiff has the residual functional capacity (RFC) to perform unskilled work at all exertional levels. Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. A job is considered unskilled if the primary work duties are handling, feeding and off-bearing, or machine tending, a person can usually learn to do the job in thirty (30) days, and little specific vocational preparation and judgment are needed (20 C.F.R. §§ 404.1568(a) and 416.968(a)).

5) Plaintiff has no past relevant work (20 C.F.R. § 416.965).

6) Plaintiff was born on April 19, 1982, and was 22 years old on the date the SSI application was filed, which is defined as a younger individual, aged 18–44 (20 C.F.R. § 416.963).

7) Plaintiff has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB) or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

8) Transferability of jobs skills is not an issue because Plaintiff does not have past relevant work (20 C.F.R. § 416.968).

9) Considering Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform (20 C.F.R. §§ 416.960(c) and 416.966).

10) Plaintiff has not been under a "disability," as defined in the Act, at any time through December 8, 2006, the date of the ALJ's decision (20 C.F.R. § 416.920(g)).

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV. PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[2]

### A. Personal History

Plaintiff is single with a tenth grade education, and she has a daughter that was born on January 14, 2003 and lives with her. She does not have a driver's license and has never had one. She is five feet, one inch tall, weighs 150 pounds, and is right-handed. Plaintiff has worked as a fast food worker and made only $1,200 in a year; she also worked as custodian in 2004. She has never worked more than six months at a time. Plaintiff states that she cannot take stress and being around people. She was hospitalized in 2000 after trying to commit suicide. She has auditory hallucinations that have improved somewhat, but she still has them, and they affect her in many different ways. For example, Plaintiff hears voices that say all different kinds of things, such as "you are ugly, they are going to get you, and I'm gonna kill you." She has told her doctors about the hallucinations, and she remains on medication. Plaintiff has Section 8 housing and pays $61.00 a month in rent. Her child receives an SSI check for $531.00, which began in May or July of 2006. Her daughter has several different medical problems such as asthma, reflux, epilepsy, and other problems. Plaintiff uses the child's check for the household. Plaintiff tried to get support from the child's father, but he is not working. Plaintiff testified that she has no physical problems that keep her from working, only mental, and her family has a history of mental health problems.

### B. Relevant Medical History

The medical evidence contains a history and physical examination by Evelyn A. Manreal, M.D., dated February 5, 2000. It indicates that Plaintiff was involuntarily admitted to Baptist Hospital, Pensacola, Florida, after being Baker Acted due to an overdose of Tylenol, Excedrin PM, and Amoxicillin. Plaintiff reported having a conflict with her mother and sisters which had been an ongoing problem at home. She reported that she was not sleeping well and had a decreased appetite and feelings of hopelessness. She stated that she overdosed herself to end her life, but she denied present suicidal intent. She also denied any auditory hallucinations, visual hallucinations, and any alcohol or drug use. Plaintiff stated that she had a lot of friends and enjoyed their company. On mental status examination, Plaintiff's mood was noted as quite anxious and depressed with affect appropriate to mood. She again denied any auditory or visual hallucinations. She did state,

[2]Unless otherwise noted, the information in this section is derived from the opinion of ALJ.

however, that she was suspicious of her family and thought that they might do something to her. Her insight was fair. The diagnostic impression was Adjustment Disorder with depressed mood and her Global Assessment of Functioning (GAF) was rated as 35 (Tr. 147–48).[3] She was started on Zoloft at Baptist Hospital. Medical records from Lakeview Center contain a psychiatric evaluation/discharge note dated February 10, 2000, by Luis C. Lemus, M.D.[4] (Tr. 203–06). The discharge note reflects Plaintiff's report that this was the first time she had overdosed on medications (Tr. 203). She reported suicidal thoughts in the past, but no attempts, and this was the first time she had been hospitalized. Plaintiff reported no psychotic, obsessive-compulsive, manic, or anxiety symptoms, no eating disorder pattern, and no enuresis or encopresis. She also denied any history of psychiatric illness in herself or her family. Plaintiff's behavior on the unit was reported as very appropriate. On mental status examination, Plaintiff's mood was reported as moderately depressed. Her affect was mildly depressed. There was no report or evidence of psychotic symptoms. She emphatically denied suicidal ideas or any ideas of violence toward others or property. Her level of attention and consciousness did not fluctuate during the interview. Her intelligence was estimated at average. Her cognitive functions were intact. She answered properly to social judgment questions. Her insight about her problems was adequate. She agreed to follow recommendations, as well as voluntary hospitalization. Plaintiff was diagnosed with a Depressive Disorder, NOS; Oppositional Defiant Disorder; and Parent–Child Relational Conflict. Her current GAF was rated as 50,[5] and the previous year's GAF was assessed as 60. Plaintiff was discharged in an improved

---

[3]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 31 and 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). *Id*.

[4]Plaintiff was transferred to the care of Dr. Lemus due to the lack of coverage at Baptist Hospital, where Plaintiff was admitted after her overdose.

[5]A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

condition to her mother. She was to continue on Zoloft 100 mg and was referred to outpatient therapy (Tr. 203–06).

Plaintiff was next seen at Lakeview Center more than two years later, on July 3, 2002, at which time she was three months pregnant and concerned about how she was going to be able to take care of her baby. It was noted that she was no longer in a relationship with the baby's father. It was further noted that Plaintiff was in treatment as an adolescent and took Zoloft for a brief time. She was not employed at that time, but reported working in the past as a fast food worker and babysitter. At the time of the evaluation, she was noted as tearful but cooperative. She denied intent to harm herself or others, and she explained that auditory hallucinations were not of the command type. She was diagnosed with a Major Depressive Disorder with psychotic features and referred to the depression group (Tr. 201–02).

Plaintiff was next seen at Lakeview Center on October 10, 2003, by Elizabeth Roberson, M.D. (Tr. 198–200). It was reported that she was self-referred for assessment and treatment of depression and auditory hallucinations. She reported that "I'm still hearing voices and feeling depressed." She noted that she had been off all medications since she was eight months pregnant and reported that she delivered her daughter in January of 2003. Since that time, she reported that her depression had worsened and that she was also experiencing auditory hallucinations. It was further noted that Plaintiff had been hospitalized in February 2000 and at that time she did not indicate any auditory hallucinations, although she reported that she had been hearing voices for many years and believed that they started when she was a teenager. On mental status examination, Plaintiff stated that her mood was "bad" with a very irritable and angry affect. She endorsed suicidal ideation without clear intent or plan. Her thought processes were linear and goal directed. She endorsed auditory hallucinations that made derogatory comments about her, as well as command hallucinations telling her to hurt or kill herself. She denied any visual hallucinations and did not demonstrate overt delusions. She was alert and oriented to person, place, time, and situation. No gross cognitive deficits were appreciated. Her insight and judgment were fairly good. Her intelligence appeared average. The impression was Major Depressive Disorder, recurrent, severe with psychotic features, rule out Schizoaeffective Disorder. Plaintiff was started on Zoloft and Risperdal (*id.*). On October 31, 2003, Plaintiff returned and reported to Dr. Roberson that she was

not having any problems tolerating her medications. She believed that Zoloft was beginning to help with her depression (Tr. 197). Specifically, she was noticing less sadness and less irritability. She reported that suicidal thoughts had subsided since her last appointment. She also felt that Risperdal was helping her sleep at night. She believed that her auditory hallucinations were less frequent and less intense. Plaintiff was continued on Zoloft, and her Risperdal was increased to 2 mg. Plaintiff was also referred to intensive case management services (*id.*).

On November 17, 2003, Dr. Roberson saw Plaintiff for medication follow-up at which time it was noted that she had been off Zoloft for at least one week after running out of medication (Tr. 195–96). Overall, Plaintiff reported that her irritability was decreased since her first appointment. It was also noted that she was also able to get case management services since she was last seen and they appeared to be very actively involved in her case. She was accompanied by her case managers. She appeared very mildly irritable on one or two occasions during the appointment, but otherwise she was cooperative and calm during her appointment. Her stated mood was "still depressed" with a blunt affect. She denied any overt hallucinations. She was alert and oriented to person, place, and time. Plaintiff was to restart Zoloft 10 mg, and her Risperdal was increased to 3 mg. She was also started on Congentin for muscle stiffness (*id.*).

On December 16, 2003, Plaintiff reported to Dr. Roberson that Congentin helped with muscle stiffness and sleep (Tr. 193–94). She also reported that the Risperdal was helping with the auditory hallucinations, but they remained. She denied experiencing command hallucinations to hurt herself, but she noted that the voices sometimes told her to hurt others, especially people she is angry with, such as the father of her daughter. She stated that she was able to ignore the hallucinations and not act on them and that they were now less intense and less frequent. She denied that she had any problem restarting Zoloft and indicated that she felt it was helping her depression. Overall, she felt that she was functioning much better than two months earlier. Her stated mood was "better," with a more relaxed affect that was improved in range and intensity. She denied any current visual hallucinations and did not demonstrate any overt delusions (*id.*). Plaintiff was diagnosed with "Major Depressive Disorder, Recurrent, Severe with Psychotic Features vs. Schizoaeffective Disorder, Depressed Type, in partial remission" (Tr. 193). She was noted to be having a good response to Zoloft, and she was continued on her medications (Tr. 194).

Plaintiff was next seen at Lakeview Center on June 8, 2004, and was seen by Jason Jones, ARNP (Tr. 191–92). Plaintiff reported that she was better since her Risperdal had been increased, she felt the medications were working quite well for her, and she did not want them to be changed. However, she reported that she sometimes got anxious. She was started on Vistaril 25 mg, which was noted to be a very mild anti-anxiety medication and was to be taken "as needed." Plaintiff's GAF was rated as 55 (*id.*).

On October 22, 2004, Plaintiff called Lakeview and reported that she had lost her apartment during Hurricane Ivan (Tr. 190). She had been unable to attend services at that time due to the loss. She reported that she had attended Community Rehabilitation Services where she received basic living skills, social rehabilitation skills, and vocational training from the rehabilitation instructors while in the program. Continued care was recommended (*id.*).

On December 2, 2004, Plaintiff reported to ARNP Jones that she had been off her medication for two months and was starting to get depressed, irritable, anxious, guilty, and tearful, and she reported hearing voices and having problems with sleep (Tr. 187). Her GAF was rated as 50 to 55. She denied suicidal and homicidal ideation, intent, or plan. Plaintiff reported that she was having problems with hallucinations during the day, as well as in the evening, and at night the voices were telling her bad things about herself. She denied delusions and paranoia. She was having some irritability and mood swings, but no symptoms of mania. It was reported that Plaintiff appeared to have the capacity to make decisions about treatment. She was restarted on Zoloft, Congentin, Risperdal, and Vistaril (Tr. 187–88).

On February 8, 2005, Plaintiff saw ARNP Jones again, reporting to him that her depression was better (Tr. 186). She was not tearful, but she still worried a lot about her social situation. She denied suicidal and homicidal ideas, intent, or plan. Her anxiety was improved somewhat, but she was still having problems financially. She denied hallucinations, delusion and paranoia. She also denied irritability, mood swings, and mania. She was continued on her medications, and her GAF was rated as 55 (*id.*).

A report dated April 18, 2005, from Elizabeth Proctor, a Social Worker with Lakeview Center, indicated that Ms. Proctor had met with Plaintiff at her home the previous day (Tr. 184). Plaintiff had broken down in tears at one point and was having a difficult time dealing with all of

her disappointment and worry. Plaintiff was very discouraged about her child's multiple health issues and because she had so little money (Tr. 184). Later that afternoon, however, Plaintiff reported feeling "a lot better" (*id.*). On May 24, 2005, Ms. Proctor again met with Plaintiff at her home (Tr. 181). Plaintiff continued to be upset because of her financial situation and because her application for SSI had been denied (*id.*). Plaintiff was very discouraged, but she had taken her medications as prescribed and had no feelings of hurting herself or anyone else (*id.*).

On July 14, 2005, Plaintiff again saw ARNP Jones, who noted that Plaintiff had some situational depression because of her social welfare problems, but she denied any suicidal or homicidal ideas, intent, or plan (Tr. 232). She reported that from time to time she felt overwhelmed, but she tried to maintain herself for her daughter's sake. She denied hallucinations, delusions, and paranoia, as well as the use of alcohol and street drugs. She reported having some irritability and moodiness, but no symptoms of mania. It was further reported that she appeared to have the capacity to make decisions about treatment. Her GAF was rated as 55, and she was continued on her medications (Tr. 232–33).

The next record from Lakeview Center is an Adult Recipient Certification, dated December 16, 2005, and prepared by Ms. Proctor (Tr. 230–31). It indicates that Plaintiff was re-certified as: 1) having a disability that was expected that last a minimum of one year and required advocacy for and coordination of services to maintain her level of functioning, 2) having had more than one admission to a crisis stabilization unit or short-term residential facility, 3) lacking a natural support system, and 4) requiring ongoing assistance to access and maintain needed care (*id.*)

Plaintiff did not return to Lakeview until September 12, 2006 (*see* Tr. 228–29 ). At that time, it was noted on a "Psychosocial Assessment Summary" that Plaintiff was seeking to reestablish psychiatric services. It was also noted that she had not been compliant with treatment (*id.*). Plaintiff reported that she was currently experiencing auditory and visual hallucinations. She stated that the voices she heard were very negative. She reported feeling depressed and anxious, and she stated that she cried often and at times for no reason. She described her sleep and appetite as good. On mental status examination, her appearance was appropriate, but her mood and affect were anxious. Her attention, concentration, and judgment were fair. Her eye contact was fair and memory was intact. She had normal speech and motor activity. She denied any delusions but did report auditory and

visual hallucinations. She was noted to be of average intellect, by estimate, and oriented times four. She had little insight. Her thought process was logical with obsessive ideas, persecutory thoughts, helplessness, and worthlessness. She denied suicidal and homicidal ideation, intent, or plan. Plaintiff's history of noncompliance was noted as a concern. She reported that she lived with a friend who was like a sister and who helped her with her child. She also reported having a supportive mother. She was diagnosed with a Major Depressive Disorder, recurrent, severe with psychosis. Her GAF was rated as 55, and Plaintiff was referred to ARNP Jones (*id.*).

On September 29, 2006, Plaintiff was seen by ARNP Jones, in collaboration with Dr. Samanta, for medication management (Tr. 225–26). Plaintiff reported that she had not seen ARNP Jones for a year because she had been too busy taking care of her daughter who has multiple medical problems (*id.*). She reported hearing voices and being depressed and tearful. She also reported that her previous medicine was doing pretty well controlling the voices, but she still had periods of depression (*id.*). She reported that she tried to work, but she did not get along very well with people. She also reported that she could not work because she has to take care of her daughter. It was noted that her daughter was in a pre-kindergarten program. Plaintiff further reported that the child's father does not have a relationship with her because paternity tests had indicated that he was not the father, although Plaintiff said she had never been with anybody else. ARNP Jones reported that Plaintiff related some depression and anxiety, but she denied suicidal or homicidal ideas, intent, or plans. She had some problems with concentration, irritability, and mood swings, but she had no apparent mania. She reported sleeping eight hours a night. She reported sometimes seeing things out of the corner of her eye at night, and she felt very uncomfortable to the extent that she slept with the light on. She denied the use of alcohol or street drugs. ARNP Jones indicated that Plaintiff appeared to have the capacity to make decisions about her treatment. Plaintiff was diagnosed with Major Depressive Disorder with psychotic features; history of Adjustment Disorder as a child, with depression; and Personality Disorder, NOS, with borderline as well as dependent features. Her GAF was rated as 55. Plaintiff was restarted on Risperdal and Lexapro (*id.*).

On November 14, 2006, ARNP Jones completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), which was also signed by Dr. Samanta. On the form, it was indicated that Plaintiff had "marked" limitations in her ability to: 1) understand and remember short,

simple instructions, 2) understand and remember detailed instructions, 3) carry out detailed instructions, and 4) make judgments on simple work-related decisions (Tr. 234). Additionally, it was indicated that Plaintiff had "marked" limitations in her ability to interact appropriately with co-workers and supervisors, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting (Tr. 235). It was further indicated that Plaintiff had "moderate" limitations in her ability to interact appropriately with the public and carry out simple instructions (Tr. 234–35). When asked what medical or clinical findings support these assessments, ARNP Jones indicated "self-report data" (*see, e.g.*, Tr. 234, 235). Furthermore, ARNP Jones indicated that Plaintiff is able to manage benefits in her own best interest (Tr. 236).

C. Other Information Within Plaintiff's Claim File

Psychologist Eric D. Martin, Ph.D., completed Mental Residual Functional Capacity Assessment and Psychiatric Review Technique forms on January 9, 1994 (Tr. 149–62). In pertinent part, he opined that Plaintiff may have had a severe mental impairment at the time of her suicide attempt and resulting hospitalization, but it did not and would not be expected to last twelve months (Tr. 149, 161). Dr. Martin additionally noted that Plaintiff's "report of auditory and [espceically] visual hallucinations (e.g., 'seeing a little green man') is of questionable credibility" (Tr. 161). He further opined that Plaintiff's "Dramatic display . . . defies credibility and is inconsistent with objective findings of [her] treating psychiatrist. Timeline indicates application for benefits quickly followed [by] initiation of treatment for this claimant who reports inability to work due to need to care for ill infant (and considerable financial concerns) (i.e., secondary gain issues involved)." (Tr. 161).

Psychologist Jane F. Cormier, Ph.D., completed a Mental Residual Functional Capacity Assessment on August 3, 2004 (Tr. 177–180). Dr. Cormier found that Plaintiff had no significant mental limitations in eighteen areas of functioning and moderate limitations in only two areas; she found that Plaintiff had no "marked" limitations in any areas (Tr. 177–78). In reaching these findings, Dr. Cormier noted that Plaintiff's reported symptoms "are somewhat suspect and her requests for treatment appear to coincide with her applications for disability benefits," and further, that Plaintiff's reports and third parties' "reports of social and adaptive deficits are not consistent with treatment notes or with employer information" (Tr. 179).

Another agency psychologist opined on June 20, 2005, that Plaintiff was "not significantly limited" in nineteen (19) areas of functioning and only moderately limited in one area (Tr. 207–08).

Finally, at Plaintiff's hearing before the ALJ, a Vocational Expert (VE) testified that Plaintiff has no past relevant work because all work previously performed was for less than six months and was considered part-time employment (Tr. 253). The VE opined that if Dr. Cormier's opinions (as contained on Exhibit 4F (Tr. 177–80)) were fully accepted, Plaintiff would be capable of performing available unskilled work (Tr. 253–54). The VE further testified that based on the limitations given by ARNP Jones and Dr. Samanta on Exhibit 4F, the "Medical Source Statement of Ability to do Work-Related Activities (Mental)," Plaintiff would be incapable of substantial gainful activity (Tr. 255–56). The VE also stated that an individual with a GAF score of 40 would be unable to perform any gainful employment,[6] but an individual with a GAF score of 55 "could generally perform at least unskilled work" and "many times people with a GAF of 50 can perform low level unskilled work" (*id.*).[7]

V. DISCUSSION

Plaintiff raises two issues on appeal. First, Plaintiff contends the ALJ erred in failing to give "considerable weight to the opinions of [Dr. Samanta and ARNP Jones,] Plaintiff's treating physician and mental health provider" (Doc. 11 at 15). Second, Plaintiff contends the ALJ erred in failing to rely on certain testimony of the VE (*id.* at 18).

A. Opinions of ARNP Jones and Dr. Samanta

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R.

[6]Plaintiff was assessed GAF scores of 40 on July 3, 2002, by a social worker at Lakeview (*see* Tr. 201–02), on October 10, 2003, by Elizabeth Roberson, M.D. (Tr. 200), and on October 22, 2004, by Mike Von Stein, B.S.W. (Tr. 190).

[7]Plaintiff was assessed a GAF score of 50 by Luis C. Lemus, M.D., on February 10, 2000, upon Plaintiff's discharge from Lakeview, and it was noted that her GAF had been as high as 60 in the last year (Tr. 203–05). Additionally, GAF scores of 55 were assessed by ARNP Jones on June 8, 2004 (Tr. 191) and February 8, 2005 (Tr. 186), and a GAF score of "50 to 55" was assessed by ARNP Jones on December 2, 2004 (Tr. 187).

§ 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

In the instant case, the ALJ did not reject all of the opinions of ARNP Jones and Dr. Samanta. He specifically rejected their opinions as contained on the form entitled "Medical Source Statement of Ability to do Work-Related Activities (Mental)" (hereafter "MSS"), in which ARNP Jones and Dr. Samanta opined that Plaintiff has numerous "marked" mental limitations (*see* Tr. 19; Tr. 234–36). The ALJ provided several reasons for rejecting these opinions. First, the ALJ noted that the opinions "seem to be inconsistent with the record as a whole and [Plaintiff's] history of medical treatment" (Tr. 19). Indeed, Plaintiff's history of sporadic treatment is inconsistent with a disabling mental condition. For example, Plaintiff claims an onset of disability date in February 2000, which is when she was hospitalized following the suicide attempt, but after her discharge she failed to seek treatment for two and a half years (Tr. 147, 201). Then, after her first treatment in July 2002, Plaintiff did not seek treatment again for more than year, until October 2003 (Tr. 198, 201). Although Plaintiff saw a physician in November and December 2003 (*see* Tr. 193–96), she did not return again until June 2004, six months later (Tr. 191). This was followed by another lapse in treatment, as Plaintiff was not seen again until late October 2004 (Tr. 190). Although Plaintiff returned for treatment on December 2, 2004, and February 8, 2005 (Tr. 186–87), she was not seen again until July 2005 (Tr. 232). Finally, following Plaintiff's July 2005 appointment, she failed to return for more than one year (*see* Tr. 228 (a Lakeview record documenting Plaintiff's return in September 2006 and noting Plaintiff's noncompliance with treatment)). A claimant's failure to seek treatment is a proper factor for the ALJ to consider. *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing). Furthermore, absence of treatment indicates that a mental impairment is non-severe. *See, e.g.*, Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).

As to inconsistencies between their treatment records and their opinions on the MSS form, the ALJ noted that Plaintiff's treatment history showed GAF scores of 55 on most assessments (Tr. 19). Indeed, as detailed above (*see, e.g.*, footnote seven, *supra*), ARNP Jones generally assessed GAF scores of 55, which is indicative of only moderate difficulty in social or occupational functioning, not "marked" difficulty. Although other practitioners assessed lower GAFs at certain

times, the opinions at issue here are those of ARNP Jones and Dr. Samanta, and their GAF scores are indeed inconsistent with the limitations found on the MSS form they later completed.

Next, the ALJ noted that Plaintiff's mental impairments were controlled by prescription medication (Tr. 19–20). The record reflects Plaintiff's acknowledgment that medication improved her condition (*see* Tr. 198, 197, 193, 191, 119, 186, 225–26). Plaintiff also noted that her symptoms worsened when she was off her medication (Tr. 187, 198). Similarly, Dr. Roberson noted that Plaintiff's condition worsened when she was off her medication (Tr. 195, 194). Moreover, Plaintiff testified that despite not having Medicaid, she was able to obtain her medications but was still noncompliant (Tr. 246). The ALJ properly considered that Plaintiff's medication controlled her symptoms and that Plaintiff was not compliant with the medication prescribed (Tr. 19–20). *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ( "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling") (citation omitted); *see also* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . .").

Finally, the ALJ noted that the opinions on the MSS form were based on Plaintiff's self-report (Tr. 19). This is indeed the case, as ARNP Jones specifically noted that the support for his assessment was Plaintiff's "self report data" (*see* Tr. 234, 235). Thus, the MSS form is only of marginal relevance — in the context of weighing the opinions of ARNP Jones and Dr. Samanta — because the form does not contain their assessments; rather, the form is a record of Plaintiff's estimations of her abilities. Moreover, to the extent the ALJ discounted Plaintiff's "self-report," he provided reasons for finding her self-report less than fully credible (*see* Tr. 19).

In pertinent part, the ALJ considered Plaintiff's daily activities, including work activity since her alleged onset, noting that Plaintiff earned income in 2001, 2002, and 2004 (Tr. 19). *See* Wolfe v. Chater, 86 F.3d 1072, 1078 (in discounting Plaintiff's complaints of pain, ALJ did not err in considering fact that claimant worked washing mobile homes during the adjudicated period); *see also* 20 C.F.R. § 404.1571 (work performed during any period in which Plaintiff alleges that she was under a disability may demonstrate an ability to perform substantial gainful activity). Moreover, although Plaintiff testified that she quit working due to stress and her inability to be around people,

(Tr. 240), Plaintiff reported to Dr. Roberson that she is unable to work "[d]ue to the fact that she must care for [her daughter and the daughter's] multiple medical problems" (Tr. 198).

The ALJ also considered the fact that Plaintiff was able to care for her daughter "who has multiple medical problems" (Tr. 19; *see also* Tr. 243–44, 247–48 (Plaintiff's testimony that she lives with her daughter, that it is "just [Plaintiff] and her daughter" living in the home, and that the daughter has multiple medical problems); Tr. 248 (Plaintiff's testimony that she is able to take care of all of her personal needs)). The ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms. *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i). Furthermore, as previously mentioned, the ALJ noted Plaintiff's failure to seek consistent medical attention, but he additionally referenced the fact that Plaintiff had been hospitalized on only one occasion (following her suicide attempt), suggesting that her mental condition was not as severe as alleged by Plaintiff (*see* Tr. 19–20).

Similarly, the court notes Dr. Cormier's opinion that Plaintiff's reported symptoms are "suspect" and that Plaintiff's requests for treatment appear to coincide with her applications for disability benefits, as did Dr. Martin (Tr. 161, 179). Indeed, after not seeking treatment for more than one year, Plaintiff returned to Lakeview Center in September 2006, reporting that she had twice been turned down for Social Security benefits (Tr. 225). Additionally, after a six-month gap in treatment, Plaintiff appeared for treatment in June 2004 reporting that she had been "turned down" for SSI (Tr. 191), and in May 2005, Plaintiff reported to a case worker that she and her daughter had both been turned down for benefits and she was "upset because of her financial situation" (Tr. 181). Moreover, after Plaintiff's treatment in July 2002, which was the first treatment following her hospitalization more than two years earlier, Plaintiff did not seek treatment again until October 2003, and at that time she reported "financial strain" and complained about not getting any financial support from her child's father (Tr. 198, 201). *See* Frey v. Bowen, 816 F.2d 508, 516 (10th Cir. 1987) (citing Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984) (subjective complaints must be evaluated with due consideration for credibility, motivation, and medical evidence); Gaddis v. Chater, 76 F.3d 893, 895–96 (8th Cir. 1996) (strong element of secondary gain in plaintiff's conduct belies his sincere belief that he is truly disabled and unable to perform any substantial gainful activity).

Furthermore, like the ALJ's finding that the opinions of ARNP Jones and Dr. Samanta on the MSS form are inconsistent with the record as a whole (Tr. 19), Dr. Cormier opined that reports by Plaintiff and third parties' regarding her "social and adaptive deficits are not consistent with treatment notes or with employer information" (Tr. 179). For example, despite Plaintiff's testimony that she "[can't] take being around people" (Tr. 240), a social worker reported that Plaintiff was able to stay on task, follow directions, and get "along well with everyone" during her participation in a rehabilitation program (Tr. 190). Additionally, although Plaintiff testified that she quit working because of stress (Tr. 240), Plaintiff reported to Dr. Roberson that she is unable to work "[d]ue to the fact that she must care for [her daughter and the daughter's] multiple medical problems" (Tr. 198).

Finally, the ALJ's finding that the opinions of ARNP Jones and Dr. Samanta are inconsistent with the record as whole, is clearly supported by the opinions of three agency psychologists, who found no significant functional limitations, and the opinions of two agency psychologists regarding Plaintiff's credibility — or, more accurately, the lack thereof.

Thus, because the ALJ articulated "good cause" for discrediting, in part, the opinions of ARNP Jones and Dr. Samanta, and because his reasons have substantial support in the record, the ALJ did not err.

B. Testimony of the VE

As the court is well aware, a hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported. *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

As discussed *supra*, the VE testified that if the opinions of ARNP Jones and Dr. Samanta on the MSS form were fully accepted, Plaintiff would be incapable of substantial gainful activity (Tr. 255–56). Plaintiff contends the ALJ erred in failing to rely on this testimony (Doc. 11 at 18–19). However, the ALJ was not required to rely on this testimony, because he properly rejected these opinions as unsupported by the record.

Similarly, Plaintiff contends that the ALJ should have found Plaintiff disabled based on the VE's responses to questions regarding Plaintiff's GAF scores as "reflected in the record as a whole"

(*id.* at 19). Initially, a GAF score, without evidence that it impaired the ability to work, does not establish an impairment. *See* Camp v. Barnhart, 103 Fed. Appx. 352, 354 (10th Cir. 2004). The assignment of a GAF score, is the last part (or axis) of a mental health practitioner's statement of a diagnosis, and is intended to rate a patient's current general overall functioning, which is useful in tracking a patient's progress in global terms. Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1984) (DSM-IV). The GAF scale is intended for use by practitioners in making treatment decisions, *see* DSM-IV-TR at 32–33, and neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." *See* 65 Fed. Reg. 50746–01, 50764–65, 2000 WL 1173632 (August 21, 2000).

Moreover, in the instant case, the VE specifically stated that an individual with GAF score of 55 "could generally perform at least unskilled work" and "many times people with a GAF of 50 can perform low level unskilled work" (Tr. 255–56). Although lower GAF scores appear in the record (*see* footnote six, *supra*), the practitioners who regularly saw Plaintiff generally assessed her with GAF scores of 55, and even immediately after Plaintiff's suicide attempt, a physician assessed her with a GAF of 50, which is when Plaintiff would have been at her worst, and as high a 60 in the preceding year. Thus, in light of the VE's testimony that individuals with GAF scores of 50 to 55 are generally able to work, the ALJ did not err in finding that Plaintiff could work, as GAF scores in the range of 50 to 55 were generally assigned to Plaintiff by those practitioners who knew her best and who saw her most often.

Finally, the court notes that the VE was asked to consider a hypothetical person with moderate limitations in her ability to maintain attention and concentration for extended periods, and moderate limitations in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" (Tr. 177–78, 253). In response to a question regarding whether such a person could perform any available work, the VE stated that the person could perform very low level repetitive unskilled work including work as a poultry worker (with 3,090 positions available regionally and 220,426 positions available nationally), cleaner-

housekeeper (27,053 positions regionally, 912,340 positions nationally), and garment folder (3,493 positions regionally, 910,919 positions nationally) (Tr. 254). Additionally, the VE stated that there would be 2,000,000 jobs at the sedentary and light levels of low level unskilled work available nationally and 40,000 to 45,000 positions regionally (*id.*). The court concludes that the hypothetical individual in the foregoing example, accurately characterizes the Plaintiff in this case, and is consistent with the record as a whole. Thus, the ALJ did not err in concluding that Plaintiff was capable of performing available work, and correspondingly, that she is not disabled.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 16th day of June 2008.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**